IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLARENCE GODBOULDT,

        Petitioner,                    No. CIV S-03-1683 GEB GGH P

    vs.

A.A. LaMARQUE, et al.,

        Respondents.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I.  <u>Introduction</u>

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction for robbery (Cal. Penal Code § 211) and making a threat to commit a crime resulting in death or great bodily injury (Cal. Penal Code § 422).  Petitioner is serving a sentence of 60 years to life pursuant to the Three Strikes law and a prior serious felony enhancement provision.

        This action is proceeding on the second amended petition filed February 16, 2005.  Petitioner raises two claims: 1) ineffective assistance of counsel; 2) insufficient evidence.  After carefully considering the record, the court recommends that the petition be denied.

/////

/////

1

II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III.  Discussion

A.  Factual Background

The opinion of the California Court of Appeal contains a factual summary of petitioner's offenses.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

On April 16, 1999, Kevin Holt (Holt) was walking home at about 10 p.m., after having gone to a nearby convenience store to buy a soda.  He was confronted by a man who reeked of alcohol, demanding money.  The man declined the 11 cents Holt had on him, but took Holt's watch.  Holt thought he might be physically hurt if he did not hand over the watch.  The man then told Holt to take off running and

he would not be hurt.  Holt did so, and ran to his home, which was about a block away.  When Holt arrived home, he called the police.

Two officers in separate units responded, Deputies Helfrick and Wright.  Deputy Wright also had a "ride-a-long" with him, Debra Eichinger.  Holt described the suspect to the officers, and Wright found the suspect a short time later; the suspect was still in the area of the robbery and was wearing a watch that matched Holt's description.  Deputy Helfrick brought Holt to the scene for an in-field identification.  Holt positively identified defendant and the watch.

Defendant was arrested, and transported with Wright and Eichinger.  To Wright and Eichinger, defendant made threats to kill Holt and his family (defendant thought Eichinger was Holt's mother).  These threats were later conveyed to Holt. We will discuss these threats in more detail in section 3 in our discussion.

Holt had been diagnosed as a paranoid schizophrenic in 1986.  He was on medication at the time of the incident with defendant; he said he had been stable for two and a half years prior to the incident.

Defendant testified that Holt approached him on the night of April 16, 1999, saying something like, "Yo, what's up, bro."  Defendant interpreted Holt's greeting as a request for drugs; he told Hold he did not have any, and to leave. Defendant denied ever physically threatening Holt, ever asking for money, or ever asking for Holt's watch.  According to defendant, when Holt began walking away, defendant bent down, got a cigarette out of his sock and picked up a watch from the ground.  The defense queried why defendant would remain in the area wearing the watch if he had just robbed Holt; however, the record reflects defendant lived in the area as well.

Defendant conceded he cursed generally at the officers, but he denied making the threats attributed to him.

Respondent's Lodged Document no. 6, pp. 2-4.

        B.  <u>Ineffective Assistance of Counsel</u>

        *Standards for Ineffective Assistance of Counsel*

        The test for demonstrating ineffective assistance of counsel is set forth in

<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

that, considering all the circumstances, counsel's performance fell below an objective standard of

reasonableness.  <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

identify the acts or omissions that are alleged not to have been the result of reasonable

professional judgment.  <u>Id</u>. at 690, 104 S. Ct. at 2066.  The federal court must then determine

whether in light of all the circumstances, the identified acts or omissions were outside the wide

range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

1      *Analysis*

2           The Sacramento County Superior Court was the last state court to issued a

3    reasoned opinion addressing this claim.  Respondent's Lodged Document no. 10.  Accordingly,

4    the court considers whether the denial of this claim by the Superior Court was an unreasonable

5    application of clearly established Supreme Court authority.

6           Petitioner argues that his counsel was ineffective for failing to investigate the

7    medical history of complaining witness Holt.  Petitioner contends that Holt was under a

8    conservatorship for mental illness and maintained on medication at the time of the incident.

9    Petitioner contends that based on these circumstances, defense counsel had a duty to obtain

10   Holt's medical records and to interview witnesses with knowledge of the extent to which Holt

11   continued to suffer from paranoid delusions that would affect his credibility.  Petitioner argues

12   that had counsel obtained these records and interviewed these witnesses, he could have

13   demonstrated that Holt was off his medication and using street drugs and was, as a consequence,

14   delusional at the time of the robbery.  Petitioner seeks an evidentiary hearing as to this claim.

15          Although petitioner's habeas petition is governed by the Anti-Terrorism and

16   Effective Death Penalty Act (AEDPA), which limits a district court's discretion to conduct

17   evidentiary hearings, see 28 U.S.C. § 2254(e)(2) (providing that petitioners who fail to develop

18   the facts in state court may not obtain an evidentiary hearing in district court except in limited

19   circumstances), this court assesses the availability of an evidentiary hearing under pre-AEDPA

20   law because petitioner exercised sufficient diligence in seeking to develop the factual basis of his

21   claim in state court.  Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479 (2000) ("If there has

22   been no lack of diligence at the relevant stages of the state court proceedings, the prisoner has not

23   'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from

24   showing compliance with the balance of the subsection's requirements.").

25          Ordinary diligence requires that petitioner seek an evidentiary hearing in state

26   court in the manner prescribed by state law.  Id.  Under California law, an appellate court, when

1   presented with a state habeas petition, determines whether an evidentiary hearing is warranted

2   only after the parties file formal pleadings, if they are ordered to do so.  Horton v. Mayle, 408

3   F.3d 570, 582 (9th Cir. 2005), citing People v. Duvall, 9 Cal.4th 464, 37 Cal.Rptr.2d 259, 886

4   P.2d 1252, 1258-61 (1995); People v. Romero, 8 Cal.4th 728, 35 Cal.Rptr.2d 270, 883, P.2d 388,

5   391-94 (1994).

6             In the instant case, the state courts denied petitioner's state habeas petitions

7   without ordering formal pleadings.  Because petitioner did not reach the stage of the proceedings

8   at which an evidentiary hearing should be requested, he has not shown a lack of diligence at the

9   relevant stages of the state court proceedings and is not subject to AEDPA's restriction on

10  evidentiary hearings.

11            "Under pre-AEDPA law, a habeas petitioner is entitled to an evidentiary hearing

12  on a claim where the facts are in dispute if 1) he has alleged facts that, if proven, would entitle

13  him to relief, and 2) he did not receive a full and fair evidentiary hearing in state court.  See Silva

14  v. Calderon, 279 F.3d 825, 853 (9th Cir. 2002).

15            In order to receive an evidentiary hearing, petitioner may not assert merely

16  conclusory statements unsupported by any proof or offer of proof.  Phillips v. Woodford, 267

17  F.3d 966, 973 (9th Cir. 2001).  Conclusory allegations by counsel that are unsworn and

18  unsupported by any offer of proof do not provide an adequate basis to obtain a federal evidentiary

19  hearing.  Id. at 973.

20            As discussed above, petitioner alleges in the second amended petition that

21  witnesses exist who could have testified that Holt was delusional at the time of the incident, off

22  his medication and using street drugs.  However, these allegations are not supported by any offer

23  of proof.  For example, petitioner does not identify any of these witnesses.

24            In contrast, attached to the answer is the declaration of defense counsel explaining

25  that he interviewed Holt before trial and determined that he was not delusional:

26  \\\\\

2. As part of my preparation for Mr. Godbouldt's trial, I interviewed the complaining witness, Mr. Kevin Holt, in his home. I was mindful of Mr. Holt's previous mental diagnosis. Part of the reason I spoke with him was to assess his demeanor and competency. It seemed apparent to me that Mr. Holt was neither delusional nor incompetent.

I was aware that Mr. Holt's mental health had improved based upon a then recent conservator assessment. I may have seen the cover page of such an assessment, but because of the passage of time, I am not certain. I, therefore, concluded that I could hurt the defense by attempting to pursue in trial mental health discovery. Nevertheless, I did explore Mr. Holt's mental and emotional condition during my cross-examination.

3. Mr. Holt's impression at trial leaves me confident that my assessment of his competency was correct.

At trial, Holt's mental health issues were addressed on direct and cross-examination. On direct, Holt testified that in 1986 he was diagnosed as paranoid schizophrenic. RT at 30. At that time, Holt was using methamphetamine. RT at 31. He also previously used cocaine. RT at 34. Holt had had delusions regarding heaven and hell. RT at 31. Holt testified that at the time of trial, he had been stable for 2 ½ years. RT at 31-32. At the time of trial, he had been taking Clozaril and Lithium for 2 ½ years. RT at 32. Holt testified that at the time of the robbery, he was taking both of these medications. RT at 32.

Holt testified that he was not suffering from delusions on that night of the incident:

Q: Now, Kevin, with your background, with the mental illness that you suffer from, someone may think that this was just a delusion that happened to you.

A: It was real. It was fact, matter. It was real matter. It was matter. It was just going–I knew it was real. It was real.

Q: How do you know it was real and it wasn't something like a trick that your mind was playing on you?

A: Well, all the tricks, delusional and dimensional things that I had happened to me, matter don't happen either. You know, like, um, delusional can be hallucinations, like seeing lights or something like that. When you're paranoid schizophrenic, you can tell reality between delusions and stuff unless you are really, really in a state of mind that you can't really tell and you can't rationalize. But that time of night I wasn't delusional or nothing. It happened.

RT at 53-54.

8

1    Petitioner's counsel cross-examined Holt regarding his mental illness and the

2    drugs he was taking as well as the conservatorship.  RT at 55-57.  Counsel also asked Holt

3    regarding whether he had been in the area to purchase cocaine.  RT at 88.

4    As noted by respondent, Holt's testimony regarding the incident was corroborated

5    by the fact that petitioner was caught wearing his watch in the vicinity of the crime.  In addition,

6    petitioner appeared intoxicated which was consistent with Holt's testimony that the robber

7    appeared intoxicated.  In addition, petitioner made threats to kill Holt and his family.

8    While petitioner is not required to rebut the evidence discussed above, he must at

9    least present more than conclusory and unsupported allegations to obtain an evidentiary hearing.

10   This he has not done.  Accordingly, because petitioner is not entitled to an evidentiary hearing as

11   to his ineffective assistance of counsel claim, this claim must be denied.

12   C.  Insufficient Evidence

13   *Legal Standard*

14   When a challenge is brought alleging insufficient evidence, federal habeas corpus

15   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

16   most favorable to the prosecution, no rational trier of fact could have found "the essential

17   elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

18   319, 99 S. Ct. 2781, 2789 (1979).  Under Jackson, the court reviews the entire record when the

19   sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts, 758 F.2d 441, 448 n.

20   11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483

21   U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

22   evidence, and to draw reasonable inferences from basic facts."  Jackson, 443 U.S. at 319, 99 S.

23   Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable

24   doubt.  It is whether rational jurors could have reached the same conclusion that these jurors

25   reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

26   \\\\\

9

1    If the trier of fact could draw conflicting inferences from the evidence, the court in

2    its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

3    469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

4    at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

5    trier of fact could have found the conviction scenario beyond a reasonable doubt.

6          In reviewing the sufficiency of the evidence supporting a
          conviction, we search the record to determine "whether a
7          reasonable jury, after viewing the evidence in the light most
          favorable to the government, could have found the defendants
8          guilty beyond a reasonable doubt of each essential element of the
          crime charged."  United States v. Douglass, 780 F.2d 1472, 1476
9          (9th Cir.1986).  *The relevant inquiry is not whether the evidence
          excludes every hypothesis except guilt, but whether the jury could
10         reasonably arrive at its verdict.*  United States v. Fleishman, 684
          F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct.
11         464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d
          1337, 1343 (9th Cir.1981), overruled on other grounds, United
12         States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

13   United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)(emphasis added).

14        Superimposed on these already stringent insufficiency standards is the AEDPA

15   requirement that even if a federal court were to initially find on its own that no reasonable jury

16   should have arrived at its conclusion, the federal court must also determine that the state

17   appellate court not have affirmed the verdict under the Jackson standard in the absence of an

18   unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

19        *Analysis*

20        Petitioner argues that there was insufficient evidence to support his conviction for

21   threats to commit a crime resulting in death or great bodily injury.  The California Court of

22   Appeal denied this claim for the following reasons:

23         This conviction resulted from the threats directed at Holt and his family that
          defendant uttered to Officer Wright and Wright's ride-a-long companion, Debra
24         Eichinger, on the night defendant was arrested for the robbery.

25         Briefly, the elements of the section 422 offense are a threat of death or great
          bodily injury made willfully and with the specific intent of being taken as a threat
26         (the accused, however, need have no intent of actually carrying out the threat); the

1  threat must convey to the victim a gravity of purpose and an immediate prospect
   of execution of the threat ("immediate" includes a degree of seriousness
2  understood by the victim to attach to the future prospect of the threat being carried
   out); and the threat must cause the victim reasonably to be in sustained fear for his
3  safety or for the safety of his immediate family. [Footnote omitted.]

4         *****

5  Finally, defendant maintains the evidence is insufficient to show the required
   element of sustained fear.  In reviewing this challenge to the sufficiency of the
6  evidence, we must consider the evidence in the light most favorable to the
   prosecution and determine whether any rational trier of fact could have found the
7  element of sustained fear beyond a reasonable doubt. [Footnote omitted.]
   "Sustained fear" "means a period of time that extends beyond what is momentary,
8  fleeting, or transitory." [Footnote omitted.]

9  Thinking that Eichinger was Holt's mother, defendant, at the time of his arrest,
   cursed at her and said he would kill her, her son, and her family.  He added that he
10 did not want to return to jail and he would find them and kill them when he got
   out.  From the time he was arrested until he was taken to the police station,
11 defendant continued making such threats.

12 Three days afer the incident, officers called Holt and told him that defendant had
   threatened to kill the Holt family; at this point, Holt was not afraid because
13 defendant was in custody.  On the morning of September 27, 1999, just before
   Holt testified at trial, Eichinger informed Holt of defendant's threats, including
14 that defendant had threatened to kill Holt and his family when defendant got out
   of jail.  After hearing this, Holt's heart "sunk...a little bit" and he cried "a little
15 bit."  Holt testified at trial that he was scared of the person who took his watch
   "that night," and still scared of him "today."  Holt added that if he saw defendant
16 outside the courtroom, he would be afraid of him.

17 We conclude there was sufficient evidence of sustained fear.  The threats were
   serious and were uttered continuously.  They encompassed Holt and his family,
18 and they were directed at Eichinger whom defendant thought was Holt's mother.
   Defendant added that he would find Holt and his family when he got out of jail
19 and kill them.  When informed of the threats by Eichinger, Holt testified he cried
   and was scared.  Holt added that if he saw defendant outside the courtroom, he
20 would be afraid of him.  The defendant had placed fear into Holt on the night of
   the incident ""[t]he victim's knowledge of defendant's prior conduct is relevant in
21 establishing that the victim was in a state of sustained fear" for section 422
   purposes.") [Footnote omitted.] On this record, a rational jury could find beyond a
22 reasonable doubt that Holt's fear was more than momentary, fleeting, or
   transitory.

23

24 Respondent's Lodged Document no. 6, pp. 12-18.

25        Petitioner argues that there was not sufficient evidence that Holt suffered

26 sustained fear.  On direct examination, Holt testified as follows regarding the threats made by

11

petitioner:

> Q: Kevin, you were advised of certain threats that the individual who had been detained had made against you or your family?
>
> A: Yeah.
>
> Q: Who told you about those threats?
>
> A: Some lady detective or something.  She said that he made threats that he was going to kill me and my family when he got out.
>
> Q: Okay.  The person who told you about these threats, was that person there that night when—
>
> A: The lady that briefed me today, she told me that she was there that night.
>
> Q: She was with the other officers?
>
> A: She was with the other officers.
>
> Q: How did that make you feel when you heard about those threats?
>
> A: Kind of sunk my heart a little bit.  Kind of made me cry a little bit.
>
> Q: Why?
>
> A: Anybody would cry if they're saying that somebody is going to want to kill their family, you know.
>
> Q: Were you scared of the person who took your watch that night?
>
> A: Yes, I was.   He was–yeah.
>
> Q: Are you still scared of him today?
>
> A: In a way, I am.

RT at 52-53.

> On cross-examination, Holt testified as follows regarding the threats:
>
> Q: Okay.  Do you remember Mr. Blazina [the prosecutor] asking you questions about how you felt when somebody threatened you?
>
> A: Felt threatened.  You know, I felt that he was going to hurt me.
>
> Q: Okay.
>
> A: I felt that the incident happened twice, when I first met him and at the end when he took my watch.

Q: Okay.  When were you told about these alleged threats?

A: Oh, the threats that the lady came and talked to me about earlier before the court session?

Q: Yes.

A: The threats were that night when–after I told him that was the person that–I told him that was the person that took my watch, later that evening, about ten minutes later, she said that he told her or the cop or whatever, that he was going to kill my mom and kill me when he got out of jail and–but I didn't hear nothing about that until the process before court.

Q: Okay.  So that night when you did that field identification when the officer took you back to Cobalt.

A: Yeah.  See, I was sitting in the car and I had no recollection of anything–

Q: You weren't told?

A: Well, they said something about that prior before the deal, but I didn't really acknowledge it because we were going through so much.

Q: So that particular night you don't recall hearing about any alleged threats?

A: The only thing I recall is he said that lady was my mom and he was going to hurt her.  That is the only thing I heard.  And before court I found out when he gets out of jail, he is going to hurt my mom, he is going to kill my mom and kill me.

Q: That is what somebody told you?

A: That is what I was presented at the beginning of court.

Q: That is like today or—

A: That was today.

Q: Today?

A: Yeah.

Q: That is the first you've heard of it?

A: That's the first of it.  The only thing I heard prior to that was the lady with blond hair, he said that he thought she was my mom and that he was gonna hurt her.

Q: So, how long before you walked into this courtroom did you first hear about these threats?

13

A: Well, I heard it in the building at G Street.

Q: The District Attorney's office?

A: Yeah, and then we walked here from there to here.  And when court started, it was about 25 minutes or 30 minutes, something like that.

Q: In terms of fear that you were talking about from April the 16th until 25 minutes or so before you actually came to this courtroom, you didn't have any fear about any threats because you didn't know about any of them; is that correct?

A: No.  Huh-uh.

Q: Meaning is that a correct statement?

A: Well, now that I recognize the police department did call like three days after the incident saying that the gentleman that took the watch from me had threatened my family, but I didn't worry about that at the time because I knew he was in a lock-up.

Q: And at that time you saw him when you were taken back by the police officer, he was in the back seat of the police car and then let out by another officer who had him handcuffed, right?

A: Yeah.

Q: And you were not afraid of that?

A: No, because I had the police car between him and me and I didn't know nothing about it until–when he got out of the car and they put him back in and the gentleman came up to me and he had paraphernalia like crank or crack or whatever, and he asked which was mine, which the statement was not.

*****

Q: Okay, so would it be a true statement that one of the officers told you about a possible threat against you about three days after the watch incident; is that correct?

A: Three days later.

Q: Okay, and at that time, you were not worried?

A: No, because I knew he was in lockup, and then I—

RT at 85-88.

/////

/////

14

On re-direct, Holt was questioned again regarding his fear:

Q: You were asked some questions about whether you are scared of the defendant today.  We are in kind of a controlled situation here—

A: Well, he still looks threatening, though, so...

Q: If you were to see him outside of this courtroom, just run into him on the street, would you be scared of him?

A: Yeah, I would be.

RT at 91-92.

As stated by the California Court of Appeal, an element of § 422, threat to commit crime resulting in death or great bodily injury, is that the threat must cause the victim reasonably to be in sustained fear for his safety or for the safety of his immediate family.  Petitioner argues that there was insufficient evidence of this element.

Sustained fear must be more than momentary, fleeting or transitory. People v. Allen, 33 Cal.App.4th 1149, 1156, 40 Cal.Rptr.2d 7 (1995).  In evaluating whether sustained fear occurred, the court looks at all the surrounding circumstances.  People v. Solis, 90 Cal.App.4th 1002, 1013, 109 Cal.Rptr.2d 464 (2001).  There need not be a present ability to carry out the threat.  People v. Lopez, 74 Cal. App. 4th 675, 679, 88 Cal. Rptr. 2d 252, 254 (1999).[1]

In Allen, the California Court of Appeal held that the evidence was sufficient to support the "sustained fear" element of section 422 when the defendant, who had previously broken into the victim's home while repeatedly stalking and assaulting her daughter (his former girlfriend), pointed a gun at the victim, threatened to kill her and was arrested fifteen minutes later after the victim called the police.  The Allen court found that the fifteen minute period between the threat and the defendant's arrest established the victim reasonably sustained fear because the victim knew about the defendant's prior conduct toward her daughter and had called

---

[1]  Where the threat was not personally communicated, the state must show that defendant specifically intended the threat to be communicated to the victim.  In re Ryan D., 100 Cal. App. 4th 854, 861, 123 Cal. Rptr. 2d 193 92002).  Petitioner does not contest this requirement.

1   the police during the earlier incidents.  <u>Allen</u>, 33 Cal.App.3d at 1151-1156.

2         As indicated above, the California Court of Appeal found that Holt suffered

3   sustained fear on the day of trial after he was reminded of the threats made by petitioner.[2]  The

4   California Court of Appeal found sufficient evidence of sustained fear based on Holt's testimony

5   that he felt his heart sink and cried a little bit, his testimony that he would be afraid of petitioner

6   if he saw him outside the courtroom and because petitioner put him in fear on the night of the

7   incident.

8         This court agrees that Holt's testimony that his heart sunk and he cried indicates

9   that he felt fear.  Whether there was sufficient evidence of sustained fear is a closer question.

10         In finding sustained fear, the California Court of Appeal relied on Holt's

11   testimony that petitioner "still looked threatening" and that he would feel fear if he ran into

12   petitioner on the street.  However, Holt did not explain whether he would feel fear of petitioner if

13   he ran into him on the street because he thought petitioner would carry out his threats, because

14   petitioner robbed him or both circumstances.   However, as discussed above, if the trier of fact

15   could draw conflicting inferences from the evidence, the court in its review will assign the

16   inference that favors conviction.  <u>McMillan v. Gomez</u>, 19 F.3d 465, 469 (9th Cir. 1994).

17   Because the jury could have inferred that Holt felt sustained fear based on the threats because he

18   thought that petitioner might carry them out if released, the court finds sufficient evidence of

19   sustained fear.

20         The denial of this claim was not an unreasonable application of clearly established

21   Supreme Court authority.  Accordingly, this claim should be denied.

22         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

23   writ of habeas corpus be denied.

24   \\\\\

25

26      [2] No case found by the undersigned requires that the victim be immediately aware of the threat.

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED: 03/12/08

                                            /s/ Gregory G. Hollows

10                                          _____

11                                          UNITED STATES MAGISTRATE JUDGE

12

13  god1683.157

14

15

16

17

18

19

20

21

22

23

24

25

26